**LANDMAN CORSI BALLAINE & FORD P.C.**
**One Gateway Center, Suite 400**
**Newark, New Jersey 07102-5388**
**(973) 623-2700**
**Attorneys for Plaintiff**
**Federal Home Loan Mortgage Corp.**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

-------------------------------------------------------------- X

**FEDERAL HOME LOAN MORTGAGE CORP.**

                     **Plaintiff,**

               **v.**

**SETH LEVINE, BENTLEY NORSE LIMITED LIABILITY COMPANY, PA WATSON VENTURES, LLC, NORSE HOLDINGS, LLC, PARK NATIONAL CAPITAL FUNDING LLC, HERBERT TEPFER AND ACTF II NEW JERSEY LLC,**

                     **Defendants.**

-------------------------------------------------------------- X

**Civil Action No. _____**

**VERIFIED COMPLAINT**

Plaintiff Federal Home Loan Mortgage Corporation ("Freddie Mac") for its Complaint in this action against Defendants hereby states the following:

### BACKGROUND

1.     Freddie Mac brings this action for legal, equitable, injunctive and declaratory relief and for the appointment of a Receiver with respect to two multifamily residential properties, one located in Jersey City, New Jersey and one in Perth Amboy, New Jersey as to which Freddie Mac holds a senior loan interest, and which have been abandoned by the owners of the properties (Defendants Bentley Norse Limited Liability Company and PA Watson Ventures, LLC). Absent immediate appointment of a Receiver - a remedy to which the owners of the properties consented in the loan documents - the properties will be without any management and will present an

imminent danger to the tenants and the public.

## JURISDICTION AND VENUE

2.    This Court has original jurisdiction of this claim under 12 U.S.C. § 1452(f), 28 U.S.C. § 1345 and 28 U.S.C. § 1331.

3.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the Defendants reside in this District, the properties that are the subject of this complaint are in this District, and/or because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## THE PARTIES

4.    Plaintiff Freddie Mac is a corporate instrumentality of the United States of America pursuant to the Federal Home Loan Mortgage Corporation Act, Title III of the Emergency Home Finance Act of 1970, 12 U.S.C. §§ 1451 and 1459, and has its principal place of business in McLean, Virginia.  Freddie Mac was placed in conservatorship under the Federal Housing Finance Agency on September 8, 2008, pursuant to 12 U.S.C. § 4617(a).

5.    Defendant Bentley Norse Limited Liability Company ("Bentley Norse") is a limited liability company created pursuant to the laws of the state of New Jersey and has its principal place of business located at 210 River Street, Suite 12, Hackensack, New Jersey.

6.    At all relevant times, Defendant Bentley Norse has been the owner of a multifamily residential building located at 9 Bentley Avenue, Jersey City, New Jersey, which building is comprised of 17 residential living units ("Jersey City Property").

7.    Defendant PA Watson, LLC ("PA Watson") is a limited liability company created pursuant to the laws of the state of New Jersey and has its principal place of business located at 210 River Street, Suite 12, Hackensack, New Jersey.

2

8.     At all relevant times, Defendant PA Watson has been the owner of a multifamily residential building located at 314-320 Watson Avenue, Perth Amboy, New Jersey, which building is comprised of 14 residential living units ("Perth Amboy Property").

9.     Defendant Norse Holdings, LLC is a limited liability company created pursuant to the laws of the state of New York and has its principal place of business located at 210 River Street, Suite 12, Hackensack, New Jersey.

10.     Defendant Seth Levine is an individual residing at 636 South Forest Drive, Teaneck, New Jersey.

11.     At all relevant times, Defendant Levine has been the sole member of Defendant PA Watson and the majority member of Defendant Bentley Norse.

12.     Upon information and belief, Defendant Levine is a member or the sole member of Defendant Norse Holdings, LLC.

13.     Defendant Levine and other companies with which he is affiliated are the owners of at least 38 other multifamily residential properties located within New Jersey.

14.     Freddie Mac purchased loans related to those 38 properties ("Trust Properties"), which loans were subsequently sold to various securitization trusts.  Freddie Mac acts as master servicer with respect to those securitization trusts.  In this Verified Complaint, Freddie Mac does not seek an adjudication of its rights or interests in the Trust Properties.

15.     Defendant Park National Capital Funding LLC is a limited liability company created pursuant to the laws of the state of New York and has its principal place of business located at 1 Stone Place, Bronxville, New York, 10708.

16.     Defendant ACTF II New Jersey LLC is a limited liability company created pursuant to the laws of the state of New Jersey and has its principal place of business located at 6600 N.

3

Andrews Ave., Suite 282, Fort Lauderdale, FL 33309.

17.    Defendant Herbert Tepfer is an individual and an attorney who has a law practice located at 4429 18th Ave., Brooklyn, New York 11204-1202.

18.    This Verified Complaint does not seek any affirmative relief against Defendants Park National Capital Funding LLC, ACTF II New Jersey LLC or Herbert Tepfer.  Rather, they are joined to this case because they are interested parties and to assure that they will be bound by any orders, decisions or rulings issued by the Court.

**FREDDIE MAC'S INTERESTS IN THE**
**JERSEY CITY AND PERTH AMBOY PROPERTIES**

19.    Effective April 25, 2019, Defendant Bentley Norse, as borrower, entered into a Multifamily Mortgage, Assignment of Rents and Security Agreement with Orix Real Estate Capital, LLC ("Orix"), as lender, covering Orix's loan to Bentley Norse ("Jersey City Loan") in the original principal amount of $2,000,000, which loan is secured by the Jersey City Property ("Jersey City Mortgage"). (**Exhibit 1**).

20.    Effective as of the same date, Bentley Norse, as borrower, and Orix, as lender, entered into a Loan Agreement setting forth the terms and conditions under which Orix would loan $2,000,000 to Bentley Norse, which loan is secured by the Jersey City Property ("Jersey City Loan Agreement"). (**Exhibit 2**).

21.    Effective as of the same date, Bentley Norse, as borrower, and Orix, as lender, entered into a Note setting forth the terms under which Bentley Norse would repay the $2,000,000 loan made by Orix, which was secured by the Jersey City Property ("Jersey City Note"). (**Exhibit 3**).

22.    Effective as of the same date, Defendant Levine executed a Guaranty wherein he personally guaranteed the $2,000,000 loan made to Bentley Norse by Orix. (**Exhibit 4**).

4

23.     On or about April 25, 2019, Orix assigned to Freddie Mac all rights, titles and interest in the Jersey City Mortgage, the Jersey City Note, the Jersey City Loan Agreement, and the Jersey City Loan Guaranty, and Freddie Mac is currently the holder of all such rights, titles and interests. (**Exhibit 5, Assignment of Mortgage and Note; Exhibit 6, Assignment of Loan Agreement and Guaranty**).

24.     Effective March 27, 2019, Defendant PA Watson, as borrower, entered into a Multifamily Mortgage, Assignment of Rents and Security Agreement with Orix, as lender, covering Orix's loan to PA Watson in the original principal amount of $1,390,000, which loan ("Perth Amboy Loan") is secured by the Perth Amboy Property ("Perth Amboy Mortgage"). (**Exhibit 7**).

25.     Effective as of the same date, PA Watson, as borrower, and Orix, as lender, entered into a Loan Agreement setting forth the terms and conditions under which Orix would loan $1,390,000 to PA Watson, which loan is secured by the Perth Amboy Property ("Perth Amboy Loan Agreement"). (**Exhibit 8**).

26.     Effective as of the same date, PA Watson, as borrower, and Orix, as lender, entered into a Note setting forth the terms under which PA Watson would repay the $1,390,000 loan made by Orix, which was secured by the Perth Amboy Property ("Perth Amboy Note"). (**Exhibit 9**).

27.     Effective as of the same date, Defendant Levine executed a Guaranty wherein he personally guaranteed the $1,390,000 loan made by Orix to PA Watson ("Perth Amboy Loan Guaranty"). (**Exhibit 10**).

28.     On or about March 27, 2019, Orix assigned to Freddie Mac all right, title and interest in the Perth Amboy Mortgage, the Perth Amboy Note, the Perth Amboy Loan Agreement, and the Perth Amboy Loan Guaranty, and Freddie Mac is currently the holder of all such rights,

4848-9333-3667v.1

titles and interests. (**Exhibit 11, Assignment of Mortgage and Note; Exhibit 12, Assignment of Loan Agreement and Guaranty**).

29.     The Jersey City Mortgage, the Jersey City Note, the Jersey City Loan Agreement, the Jersey City Loan Guaranty, the Perth Amboy Mortgage, the Perth Amboy Note, the Perth Amboy Loan Agreement, the Perth Amboy Loan Guaranty, together with all other documents related to the Jersey City Loan and the Perth Amboy Loan, are referred to collectively as the "Loan Documents."

## RELEVANT TERMS OF THE LOAN DOCUMENTS

30.     The Jersey City Loan Agreement and the Perth Amboy Loan Agreement (collectively, "Loan Agreements") contain materially identical substantive terms.

31.     Article I of each Loan Agreement (entitled "Key Terms") states that Defendant Bentley Norse and Defendant PA Watson (collectively, "Borrowers") would self-manage the Jersey City Property and Perth Amboy Property (collectively, "Properties").

32.     Article I of each Loan Agreement also identifies Defendant Seth Levine as the "Guarantor" with respect to the subject loans.

33.     Section 6.01 of each Loan Agreement addresses the conduct of illegal activities at the property, and provides, in pertinent part, that:

> Borrower will at all times take appropriate measures to prevent, and will not engage in or knowingly permit, any illegal activities at or on the Mortgaged Property, including those that could endanger tenants or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Mortgaged Property, or otherwise materially impair the Lien created by the Security Instrument or Lender's interest in the Mortgaged Property.

34.     Section 6.08 of each Loan Agreement (entitled "Taxes; Operating Expenses"), obligates Borrowers, *inter alia*, to pay when due: (a) all taxes in relation to the mortgaged

6

properties; (b) all expenses related to the operation, management, maintenance and repair of the mortgage properties (including utilities); and (c) all insurance premiums related to the mortgaged properties.

35.     Article 6.09 of each Loan Agreement sets forth the obligations of Borrowers regarding the "Preservation, Management and Maintenance of the Mortgaged Property."

36.     With respect to that topic, Article 6.09 of the Loan Agreements provides:

(a)     <u>Maintenance of Mortgaged Property; No Waste</u>. Borrower will keep the Mortgaged Property ***in good repair***, including replacing Personalty and Fixtures with items of equal or better function and quality. ***Borrower will not commit waste or permit impairment or deterioration of the Mortgaged Property***.

(b)     ***<u>Abandonment of Mortgaged Property</u>. Borrower will not abandon the Mortgaged Property.***

(c)     <u>Preservation of Mortgaged Property</u>.

(i)     Borrower will promptly restore or repair, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition, or such other condition as Lender may approve in writing . . . .

(Emphasis added.)

37.     With respect to management of the Properties, Article 6.09(l)(ii) provides that: "During any period in which Borrower self-manages the Mortgaged Property, Borrower will not engage or pay any other Person (whether an Affiliate of Borrower or otherwise) a fee or other compensation for managing the Mortgaged Property."

38.     Section 6.10 of the Loan Agreements requires that Borrowers maintain in force, *inter alia*, the following insurance with respect to the mortgaged properties: (a) property insurance; (b) liability insurance; and (c) any other insurance as required by the Lender.

39.     Section 6.10 of the Loan Agreements also imposes other obligations on Borrowers

with respect to insurance in the event of a casualty or loss, including the obligation to provide immediate written notice to the applicable insurer.

40.     The loans are without recourse to Borrowers, except under certain circumstances set forth in Article III of each Loan Agreement (entitled "Personal Liability"). That article defines the instances in which Borrowers are personally liable to Freddie Mac.

41.     Section 3.01 of the Loan Agreements provides:

> **Limited Recourse Generally**. Except as otherwise provided in this Article III, none of Borrower or any member or limited partner of Borrower (if applicable) will have any personal liability under the Note, this Loan Agreement or any other Loan Document for the repayment of the Indebtedness or for the performance of or compliance with any other obligations of Borrower under the Loan Documents, and Lender's only recourse for the satisfaction of the Indebtedness and the performance of such obligations will be Lender's exercise of its rights and remedies with respect to the Mortgaged Property and to any other collateral held by Lender as security for the Indebtedness. This limitation on Borrower's liability will not limit or impair Lender's enforcement of its rights against any Guarantor.

42.     Section 3.03 then sets forth the circumstances under which Borrowers may be held personally liable to Freddie Mac. In pertinent part, Section 3.03 provides:

> **Loss or Damage Recourse**. Borrower will be personally liable to Lender for the repayment of a portion of the Indebtedness equal to any loss or damage suffered by Lender as a result of the occurrence of any of the following events:
>
> \* \* \*
>
> (d)     Borrower engages in any willful act of material waste of the Mortgaged Property.
>
> (e)     Borrower fails to pay when due any of the following:
>
> > (i)     Taxes, if Lender does not collect a Tax Reserve Fund.
> >
> > (ii)     Insurance premiums, if Lender does not collect an Insurance Reserve Fund.

8

(iii)    Water and sewer charges that could become a lien on the Mortgaged Property.

\* \* \*

43.    Section 3.05 of the Loan Agreements sets forth additional circumstances under which Borrowers may be held personally liable to Freddie Mac.  In pertinent part, Section 3.05 provides:

> **Full Recourse**. Borrower will become personally liable to Lender for the repayment of all the Indebtedness upon the occurrence of any of the following:
>
> \* \* \*
>
> (b)    A Transfer that is an Event of Default under Section 7.02 occurs . . . .

44.    Section 7.02, which is referenced in Section 3.05(b), provides in pertinent part:

> **Prohibited Transfers**. The occurrence of any of the following Transfers will constitute an Event of Default under this Loan Agreement:
>
> (a)    *A Transfer of all or any part of the Mortgaged Property or any interest in the Mortgaged Property, including the grant, creation or existence of any Lien on the Mortgaged Property*, whether voluntary, involuntary or by operation of law, and whether or not such Lien has priority over the Lien of the Security Instrument, other than the Lien of the Security Instrument, or any other Lien to which Lender has consented.

45.    Section 3 of each of the Jersey City Guaranty and the Perth Amboy Guaranty (collectively, "Guaranties") signed by Levine provides, in pertinent part:

> (a)    Guarantor absolutely, unconditionally, and irrevocably guarantees to Lender each of the following:
>
> (i)    The full and prompt payment when due . . . of all amounts for which Borrower is personally liable under Article III of the Loan Agreement.

9

46.     Article VIII of the Loan Agreements (entitled "Events of Default and Remedies") describes, *inter alia*, the circumstances under which Borrowers will be in default of the Loan Agreements.

47.     Specifically, Section 8.01 sets forth the "Events of Default" for each Loan Agreement, including, *inter alia*, the borrowers' failure "to maintain the insurance coverage required by Section 6.10" and if "[a] Transfer occurs that violates the provisions of Article VII, whether or not any actual impairment of Lender's security results from such Transfer." (Loan Agr., §§ 8.01(d), 8.01(g)).

48.     Section 8.01(s) of the Loan Agreements provides that an "Event of Default" will also include the following:

> Borrower fails to perform any of its obligations under this Loan Agreement (other than those Events of Default specified in Sections 8.01(a) through (r) or included on any exhibit, schedule, or rider attached to this Loan Agreement) as and when required, and that failure continues for a period of 30 days after Notice of the failure by Lender to Borrower.
>
> \*        \*        \*
>
> ***No Notice or cure periods will apply in the case of any failure which could, in Lender's judgment, absent immediate exercise by Lender of a right or remedy under this Loan Agreement, result in harm to Lender, danger to tenants or third parties, or impairment of the Note, the Security Instrument, this Loan Agreement, or any other security given under any other Loan Document.*** (Emphasis added)

49.     Section 8.02 of each Loan Agreement (entitled "Protection of Lender's Security; Security Instrument Secures Future Advances") provides, in pertinent part:

> If Borrower fails to perform any of its obligations under this Loan Agreement or any other Loan Document, or if any action or proceeding is commenced which purports to affect the Mortgaged Property, Lender's security or Lender's rights under this Loan Agreement, . . . then Lender may make such appearances, file such

10

documents, disburse such sums and *take such actions as Lender reasonably deems necessary to perform such obligations of Borrower and to protect Lender's interest*, including: . . . (iii) *entry upon the Mortgaged Property to make Repairs or secure the Mortgaged Property*, (iv) *procurement of the Insurance required by Section 6.10*, (v) *payment of amounts which Borrower has failed to pay under Section 6.08*, [and] (vi) *performance of Borrower's obligations under Section 6.09*. . . . (Emphasis added)

50.     Section 8.03 of each Loan Agreement (entitled "Remedies") describes the remedies

and relief available to Freddie Mac and provides in pertinent part:

(a)     Upon an Event of Default, Lender may exercise any or all of its rights and remedies provided under the Loan Documents and Borrower will pay all associated costs, including Attorneys' Fees and Costs.

(b)     Each right and remedy provided in this Loan Agreement is distinct from all other rights or remedies under this Loan Agreement or any other Loan Document or afforded by applicable law or equity, and each will be cumulative and may be exercised concurrently, independently or successively, in any order. Lender's exercise of any particular right or remedy will not in any way prevent Lender from exercising any other right or remedy available to Lender. Lender may exercise any such remedies from time to time and as often as Lender chooses.

51.     Section 10.11 of each Loan Agreements provides:

**Determinations by Lender**. In any instance where the consent or approval of Lender may be given or is required, or where Lender is authorized to render any determination, judgment, or decision under this Loan Agreement, the granting, withholding or denial of such consent or approval and the rendering of such determination, judgment or decision will be made or exercised by Lender (or its designated representative) at its option and in its discretion.

52.     Section 10.13 of the Loan Agreements provides:

**Subordinate Financing**. Freddie Mac will not purchase, *but may permit* another lender to extend to Borrower, subordinate financing secured by the Mortgaged Property, *provided that all of Lender's requirements are satisfied.* (Emphasis added).

11

53.     The Jersey City Mortgage and the Perth Amboy Mortgage (collectively, "Mortgages") contain materially identical substantive terms

54.     Under each of the Mortgages, "an Event of Default under the Loan Agreement will constitute an Event of Default under this Instrument." (Mortgages, §§ 1, 8).

55.     Section 3 of each Mortgage is entitled "Assignment of Rents, Appointment of Receiver; Lender in Possession."

56.     Section 3 of each Mortgage provides, in pertinent part:

(a)     As part of the consideration for the Indebtedness, Borrower *absolutely and unconditionally assigns and transfers to Lender all Rents.*

    (i)     It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all Rents and *to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Borrower.*

*       *       *

(b)     (iii)     After the occurrence of an Event of Default, and during the continuance of such Event of Default, Borrower authorizes Lender *to collect, sue for and compromise Rents and directs each tenant of the Mortgaged Property to pay all Rents to, or as directed by, Lender.* From and after the occurrence of an Event of Default, and during the continuance of such Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, or by a receiver, Borrower's license to collect Rents will automatically terminate and Lender will without Notice be entitled to all Rents as they become due and payable, including Rents then due and unpaid. Borrower will pay to Lender upon demand all Rents to which Lender is entitled.

    (iv)     At any time on or after the date of Lender's demand for Rents, Lender may give, and Borrower hereby irrevocably authorizes Lender to give, *notice to all*

*tenants of the Mortgaged Property instructing them to pay all Rents to Lender . . . .*

(c)   If an Event of Default has occurred and is continuing, then Lender will have each of the following rights and may take any of the following actions:

   (i)   Lender may, regardless of the adequacy of Lender's security or the solvency of Borrower and even in the absence of waste, *enter upon and take and maintain full control of the Mortgaged Property in order to perform all acts that Lender in its discretion determines to be necessary or desirable for the operation and maintenance of the Mortgaged Property . . . .*

   (ii)   Alternatively, if an Event of Default has occurred and is continuing, regardless of the adequacy of Lender's security, without regard to Borrower's solvency and without the necessity of giving prior notice (oral or written) to Borrower, *Lender may apply to any court having jurisdiction for the appointment of a receiver for the Mortgaged Property* to take any or all of the actions set forth in the preceding sentence. If Lender elects to seek the appointment of a receiver for the Mortgaged Property at any time after an Event of Default has occurred and is continuing, *Borrower, by its execution of this Instrument, expressly consents to the appointment of such receiver*, including the appointment of a receiver ex parte if permitted by applicable law.

\* \* \*

   (iv)   Lender or the receiver, as the case may be, will be entitled to receive a reasonable fee for managing the Mortgaged Property.

   (v)   Immediately upon appointment of a receiver or immediately upon Lender's entering upon and taking possession and control of the Mortgaged Property, *Borrower will surrender possession of the Mortgaged Property to Lender or the receiver, as the case may be, and will deliver to Lender or the receiver, as the case may be, all documents*, records (including records on electronic or magnetic media), accounts, surveys, plans, and specifications relating to the Mortgaged Property *and all security deposits and prepaid*

13

*Rents*.

(vi)    If Lender takes possession and control of the Mortgaged Property, ***then Lender may exclude Borrower and its representatives from the Mortgaged Property***.

(Emphasis added).

## THE FBI RAID AND THE SUBSEQUENT FAILURE OF BENTLEY NORSE AND PA WATSON TO MANAGE THE PROPERTY

57.    Freddie Mac recently learned that: (i) on or about August 16, 2019, a search warrant for offices operated by defendant Levine and companies with which he is affiliated, including the property manager for the Properties (Defendant Norse Holdings, LLC ("Property Manager")) was executed by agents of the Federal Bureau of Investigation ("FBI"); and (ii) the search warrant was connected to a federal investigation of Defendant Levine and his companies.

58.    Upon information and belief, the offices that were the subject of the search warrant are located at 210 River Street, Suite 12, Hackensack, New Jersey.

59.    Freddie Mac has also learned that, as of approximately August 22, 2019, defendant Levine, and his affiliated companies, including the Property Manager and Borrowers are no longer actively conducting business.

60.    As a result, neither of the Properties are being managed, and Borrowers have abandoned them.

61.    On August 26, 2019, one of the primary servicers for several loans secured by certain of the Trust Properties (Hunt Real Estate Capital) ("Hunt") visited the offices of Borrowers and Property Manager in Hackensack that were the subject of the FBI's search warrant ("Levine's Office").

62.    That visit revealed that the Levine's Office is unoccupied and that unclaimed mail has accumulated underneath the front door. (**Exhibit 13, Photos Taken at Levine's Office by**

14

Hunt).

63.     Thomas Farrell (a manager in Freddie Mac's Multifamily Asset Management unit) also visited Levine's Offices on Tuesday, August 27, 2019 and photographed the same conditions. (**Exhibit 14, Photos Taken by Mr. Farrell**).

64.     On Tuesday, August 27, 2019, Defendant Levine's civil counsel, Joseph Lubertazzi, Esq. of McCarter & English had a phone conversation with counsel for Freddie Mac (Associate General Counsel, Scott L. Walker).   During that conversation, Mr. Lubertazzi confirmed that Defendant Levine and his affiliated companies, including Property Manager: (a) are, in fact, under federal investigation; (b) are no longer actively managing the multifamily properties that they own or manage nor are they collecting rent payments from tenants; and (c) had received notices from insurance companies notifying them that insurance policies with respect to certain of the multifamily properties owned by Levine's companies may have been cancelled for non-payment of premiums.   Mr. Lubertazzi also advised Mr. Walker that Mr. Levine had retained criminal counsel.

65.     During an earlier conversation with Mr. Walker on or about August 16, 2019, Mr. Lubertazzi indicated that Mr. Levine and his companies were having problems related to liquidity and cash flow.

66.     Borrowers made late payment in July payments on the loans secured by the Properties and most of the loans secured by the Trust Properties.

67.     Moreover, Defendant Levine and/or companies with which he is affiliated are presently late on their August payments for several of the Trust Properties.

68.     Freddie Mac recently learned that Defendant Levine and/or companies with which he is affiliated are presently in default on payments due to certain utility services at certain of the

Trust Properties.

69.     Freddie Mac has also been advised by Hunt that several of the multifamily properties owned by Defendant Levine and/or companies with which he is affiliated are in need of various structural repairs.  Hunt has advised that it also observed issues that presented violations of the applicable Fire and Housing Codes.

70.     As of the filing of this Verified Complaint, Freddie Mac believes that the Properties are no longer being managed by Bentley Norse, PA Watson or the Property Manager, as required by the Loan Agreements.

71.     In short, Defendant Levine and his affiliated companies - - including Borrowers, and the Property Manager -- have abandoned both the Properties and the Trust Properties.

### OTHER INTERESTS IN THE PERTH AMBOY PROPERTY

72.     Freddie Mac recently learned that the Perth Amboy Property was sold at tax sale by the City of Perth Amboy on December 19, 2018 to Defendant ACTF II New Jersey LLC. (**Exhibit 15**).

73.     The Certificate of Sale was, however, not recorded with the Middlesex County Clerk until March 28, 2019 - one day after the effective date of the Perth Amboy Mortgage, Perth Amboy Note, Perth Amboy Loan Agreement and Perth Amboy Guaranty.

74.     On or about July 30, 2019, Defendant PA Watson entered into a Declaration of Restrictions in which it agreed that it would "not transfer nor assign nor encumber all or part of" the Perth Amboy Property without the written consent of Defendant Herbert Tepfer. (**Exhibit 16**).

75.     The Declaration of Restrictions was recorded with the Middlesex County Clerk on August 14, 2019.

76.     On or about July 30, 2019, Defendant PA Watson executed a Subordinate Mortgage

16

with Defendant Park National Capital Funding LLC regarding the Perth Amboy Property. (**Exhibit 17**).

77.    The Subordinate Mortgage was recorded with the Middlesex County Clerk on August 14, 2019.

78.    Freddie Mac was not notified of the Subordinate Mortgage on the Perth Amboy Property, nor did Freddie Mac consent to the Subordinate Mortgage, as required under Section 10.13 of each Loan Agreement.

## FIRST COUNT

### BREACH OF CONTRACT
### (Against Defendants Levine, Bentley Norse, PA Watson and Norse Holdings)

79.    Freddie Mac incorporates the allegations in paragraphs 1 through 78 of this Verified Complaint as if more fully set forth herein.

80.    The Jersey City Loan Agreement is an enforceable contract between Defendant Bentley Norse and Freddie Mac.

81.    The Perth Amboy Loan Agreement is an enforceable contract between Defendant PA Watson and Freddie Mac.

82.    Borrowers have abandoned the Properties.

83.    Moreover, the Levine-controlled Property Manager has ceased conducting its property management duties as to the Properties.

84.    By abandoning the property, and no longer engaging in management of the Properties, Borrowers and Property Manager are presently in material breach of and/or will soon be in material breach of their following obligations under the respective Loan Agreements to:

4848-9333-3667v.1

(a)   take appropriate measures to prevent illegal activities at the mortgaged properties, including activities that could endanger tenants at or visitors to the mortgaged properties (Loan Agr. § 6.01);

(b)   pay all taxes related to the mortgaged properties (Loan Agr. § 6.08);

(c)   pay all expenses necessary to operate, manage, maintain and repair the mortgaged properties (Loan Agr. § 6.08);

(d)   keep the mortgaged properties in good repair (Loan Agr. §§ 6.09(a), 6.09(c));

(e)   prevent the commission of waste or the impairment or deterioration of the mortgage properties (Loan Agr. § 6.09(a));

(f)   not abandon the mortgage properties. (Loan Agr. § 6.09(b)); and

(g)   maintain the required insurance coverage in relation to the mortgaged properties and, if necessary, to make claims under those policies. (Loan Agr., § 6.10).

85.   Freddie Mac is in possession of facts indicating that Defendant Levine, Property Manager and/or other companies with whom he is affiliated are in breach of corresponding obligations at certain of the Trust Properties, including the obligation to pay utility bills, pay insurance premiums, and keep the property in safe condition.

86.   The foregoing material breaches and/or imminent material breaches of the Loan Agreements constitute Events of Default as defined in Section 8.01(s) because, in the reasonable judgment of Freddie Mac, absent immediate exercise by Freddie Mac of its rights and remedies under the Loan Agreement, further harm to the Properties, their tenants and visitors are likely, including, without limitation, the cessation of utility services, and the cancellation of insurance.

87.     Pursuant to Section 3.03 of the Loan Agreements, the foregoing breaches and/or imminent breaches by Borrowers also make those entities personally liable for any losses or damages sustained by Freddie Mac.

88.     Pursuant to Section 3 of the Jersey City Guaranty and Perth Amboy Guaranty, Levine is personally liable to Freddie Mac for any and all such losses or damages sustained by Freddie Mac.

89.     Pursuant to § 8.02 of the Loan Agreements, the remedies available to Freddie Mac include directly performing many of the obligations which have been abandoned by Borrowers at the Properties, including, *inter alia*, the following: (a) entering the mortgaged properties to secure or repair them; (b) procuring the insurance coverages required by § 6.10 of the Loan Agreements; (c) paying taxes, expenses and insurance premiums as required by § 6.08 of the Loan Agreements; and (d) performing maintenance, management and preservation of the mortgage properties as required by § 6.09 of the Loan Agreements.

90.     The foregoing also constitute material breaches and/or imminent material breaches of the Mortgages and constitute Events of Default thereunder.

91.     Accordingly, the remedies available to Freddie Mac under the Mortgages include the appointment of Receiver (to which Borrowers have consented) and all other remedies provided for in Section 3 of the Mortgages.

92.     On or about July 30, 2019, Defendants PA Watson and Levine entered into the Declaration of Restrictions applicable to the Perth Amboy Property with Defendant Tepfer.

93.     In entering into the Declaration of Restrictions, Defendants PA Watson and Levine engaged in a prohibited transfer under Section 7.02(a) of the Perth Amboy Loan Agreement, which is an Event of Default under Section 8.01(g) of the Perth Amboy Loan Agreement and the Perth

4848-9333-3667v.1

Amboy Mortgage.

94.     Defendants PA Watson and Levine granted a Subordinate Mortgage to Defendant Park National Capital Funding LLC regarding the Perth Amboy Property, without providing any notice to Freddie Mac and without obtaining Freddie Mac's consent.

95.     The granting of such Subordinate Mortgage to Defendant Park National Capital Funding LLC constitutes: (a) a material breach of Section 10.13 of the Perth Amboy Loan Agreement, and; (b) a prohibited transfer under Section 7.02(a) of the Perth Amboy Loan Agreement, which is an Event of Default under Section 8.01(g) of the Perth Amboy Loan Agreement and the Perth Amboy Mortgage.

## SECOND COUNT

### APPOINTMENT OF RECEIVER AND RELATED INJUNCTIVE RELIEF

96.     Freddie Mac incorporates the allegations in paragraphs 1 through 95 of this Verified Complaint as if more fully set forth herein.

97.     Freddie Mac seeks the appointment of a Receiver to perform the obligations set forth above and which have been abandoned by Defendant Bentley Norse and PA Watson as to the Jersey City Property and Perth Amboy Property, respectively, including, but not limited to:

(a)     Taking appropriate measures to prevent illegal activities at the mortgaged properties;

(b)     Paying all taxes related to the mortgaged properties;

(c)     Paying all expenses necessary to operate, manage, maintain and repair the mortgaged properties;

(d)     Maintaining the mortgaged properties in good repair;

4848-9333-3667v.1

(e)   Preventing waste or the impairment or deterioration of the mortgage properties; and

(f)   Maintaining the required insurance coverage in relation to the mortgaged properties and, if necessary, to make claims under those policies.

98.   Freddie Mac also seeks the appointment of the Receiver to receive all rents of the subject properties pending the outcome of this litigation.

99.   Freddie Mac also seeks related injunctive relief to enable the Receiver to discharge its duties.

100.   In particular, Freddie Mac seeks an order directing Defendants Bentley Norse, PA Watson and Levine to: (a) to deliver to the Receiver all rents and income received as to the Properties; (b) make available copies of all books and records necessary for the Receiver to discharge its duties as to each of the Properties; and (c) to refrain from interfering in the Receiver's possession and management of each of the Properties.

101.   Because there has been an Event of Default under the Mortgages, Borrowers have consented to the appointment of a Receiver in accordance with Section 3 of the Mortgages.

**WHEREFORE**, Freddie Mac respectfully requests that this Court issue the following relief with respect to Defendants Levine, Bentley Norse and PA Watson:

(a)   Immediately appoint a Receiver to perform the functions as set forth in detail in this Verified Complaint with respect to the Properties, including retention of a qualified property manager;

(b)   Declare that the Perth Amboy Mortgage and Jersey City Mortgage have been breached and that all conditions requisite to Freddie Mac's right to recover and receive rents and revenues from the Properties have occurred;

21

(c)    Appoint a Receiver for the purpose of receiving all rents and other income of the Properties;

(d)    Order Defendants to: (i) deliver to the Receiver all rents and income of as to each of the Properties; (ii) make available copies of all books and records necessary for the Receiver to discharge its duties as to each of the Properties; and (iii) refrain from interfering in the Receiver's possession and management of the Properties;

(e)    Declare and find that Defendants Levine, Bentley Norse and PA Watson are in material breach of the Loan Documents and that such breaches constitute Events of Default under same;

(f)    Issue a temporary restraining order, preliminary injunction and permanent injunction against Defendants concerning the appointment of a Receiver to perform the functions as set forth in detail in this Verified Complaint and the accompanying Proposed Form of Order to Show Cause with Temporary Restraints and Preliminary Injunction, and to receive all rents and income with respect to the Jersey City Property and the Perth Amboy Property;

(g)    An award of compensatory damages, punitive damages and attorney's fees and costs; and

(h)    Such additional and further relief as the Court may deem just and equitable, including Freddie Mac's costs, disbursements and attorneys' fees.

22

Dated:  **August 28, 2019**
        **Newark, NJ**

**LANDMAN CORSI BALLAINE & FORD P.C.**
**Attorneys for Plaintiff Federal Home Loan**
**Mortgage Corp.**

By: _____

**Jerry A. Cuomo**
**Gerald T. Ford**

**Lance Wolf, Vice President, Deputy General**
**Counsel,** *Federal Home Loan Mortgage*
*Corp.*

**Scott L. Walker, Associate General Counsel,**
*Federal Home Loan Mortgage Corp.*

**William Reynolds, Associate General**
**Counsel,** *Federal Home Loan Mortgage*
*Corp.*

23

## <u>CERTIFICATION PURSUANT TO LOCAL RULE 11.2</u>

I hereby certify that the matter in controversy in this action is not now known to me to be the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

Jerry A. Cuomo

4848-9333-3667v.1

## VERIFICATION

I, Thomas Farrell, being of lawful age, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.      I am presently employed by Plaintiff Federal Home Loan Mortgage Corporation as a Manager in Freddie Mac's Multifamily Asset Management unit.

2.      I have reviewed the facts alleged in this Verified Complaint.  The facts set forth therein are based upon my personal knowledge, information provided to me by others and/or my review of certain business records to which I have access in my position of employment.  The facts alleged in this Verified Complaint are true and correct to best of my knowledge and information.

3.      I have also reviewed the photographs attached as Exhibits 13 and 14 to this Verified Complaint.  I can confirm that the referenced Exhibits are true and correct copies of the referenced documents.

Dated: August 29, 2019
      McLean, Virginia

                                            **Thomas Farrell**

4848-9333-3667v.1

## **VERIFICATION**

I, Scott L. Walker, being of lawful age, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

4.      I am presently employed by Plaintiff Federal Home Loan Mortgage Corporation as Associate General Counsel.

5.      I have reviewed the facts alleged in this Verified Complaint.   The facts set forth therein are based upon my personal knowledge, information provided to me by others and/or my review of certain business records to which I have access in my position of employment.   The facts alleged in this Verified Complaint are true and correct to best of my knowledge and information.

6.      I have also reviewed the Exhibits to this Verified Complaint.   I can confirm that the referenced Exhibits are true and correct copies of the referenced documents.

**Dated: August 29, 2019**
       **McLean, Virginia**                                       **Scott L. Walker**

4848-9333-3667v.1